IN THE SUPREME COURT OF NORTH CAROLINA

No. 298A19

Filed 17 July 2020

IN THE MATTER OF: J.O.D.

Appeal pursuant to N.C.G.S. § 7B-1001(a1)(1) from an order entered on 17 May 2019 by Judge J.H. Corpening II in District Court, New Hanover County. This matter was calendared for argument in the Supreme Court on 19 June 2020 but determined on the records and briefs without oral argument pursuant to Rule 30(f) of the North Carolina Rules of Appellate Procedure.

*Jennifer G. Cooke for petitioner-appellee New Hanover County Department of Social Services.*

*Smith, Anderson, Blount, Dorsett, Mitchell & Jernigan, L.L.P., by J. Mitchell Armbruster, for Guardian ad Litem.*

*Sydney Batch, for respondent-appellant mother.*

*Anné C. Wright for respondent-appellant father.*

DAVIS, Justice.

In this case, we consider whether the trial court erred by terminating the parental rights of respondent-father and respondent-mother (collectively, respondents) to J.O.D. (Joshua).[1] We conclude that the trial court made sufficient

---

[1] A pseudonym is used throughout this opinion to protect the identity of the juvenile.

findings of fact, which were supported by clear, cogent, and convincing evidence, to support its conclusion that grounds existed to terminate respondent-father's parental rights on the basis of neglect. Respondent-mother's counsel has filed a no-merit brief pursuant to Rule 3.1(e) of the North Carolina Rules of Appellate Procedure. We are satisfied that the issues identified by counsel in respondent-mother's brief lack merit. Accordingly, we affirm the trial court's order terminating respondents' parental rights.

## Factual and Procedural Background

Respondents are the parents[2] of Joshua, who was born on 12 November 2017. On 5 December 2017, New Hanover County Department of Social Services (DSS) obtained nonsecure custody of Joshua and filed a juvenile petition in District Court, New Hanover County, alleging that he was a neglected juvenile. The petition alleged that: (1) Joshua's meconium tested positive for cocaine and methadone and that he had been treated with morphine and clonidine for withdrawal shortly after his birth; (2) respondent-mother had consistently tested positive for barbiturates, cocaine, and methadone prior to Joshua's birth and admitted to consistent heroin use during her pregnancy; (3) respondent-father admitted to having an opiate addiction for the past ten years; and (4) on 21 November 2017, respondent-mother tested positive for

---

[2] The trial court found that although no father was listed on Joshua's birth certificate and no paternity testing was performed, respondent-father had never denied that Joshua was his biological son and respondent-mother had never named any other male as Joshua's putative father.

methadone, cocaine, benzoylecgonine, and norcocaine, and respondent-father tested positive for methadone, benzoylecgonine, cocaine, cocaethylene, morphine, norcocaine, and heroin.

On 14 February 2018, the trial court entered an order adjudicating Joshua to be a neglected juvenile. The trial court ordered respondent-mother to comply with the terms of a family services agreement by: (1) engaging in a substance abuse program and complying with any and all recommended services; (2) completing a comprehensive clinical assessment and complying with any and all recommendations; (3) submitting to random drug screens as requested by DSS and the guardian *ad litem* (GAL); (4) completing a parenting education program and demonstrating the skills that she had learned during her interactions with Joshua; and (5) maintaining verifiable employment and housing.

Respondent-father was also ordered to comply with the terms of a family services agreement by: (1) engaging in a substance abuse program and complying with any and all recommended services; (2) submitting to random drug screens as requested by DSS and the GAL; (3) completing a parenting education program and demonstrating the skills that he had learned during his interactions with Joshua; and (4) maintaining verifiable employment and housing. Joshua remained in DSS custody following the 14 February 2018 order.

Following a hearing on 18 October 2018, the trial court entered a permanency planning order on 9 November 2018. The trial court found that respondents had been

participating in DSS's Intensive Reunification Program (IRP) and were initially successful. However, in July 2018, respondents were discharged from the program due to their continued drug use and failure to consistently engage in services required for the program. Respondents' overnight visits with Joshua were suspended on 9 June 2018 due to positive drug screens, and they were given the option of weekly supervised visitation for two hours.

Respondent-mother had maintained housing and obtained employment. However, she had failed both to engage in required counseling since 26 June 2018 and to participate in recommended relapse prevention group services since June 2018. Respondent-mother, who admitted to relapsing, submitted to seven drug screens from June to August of 2018, all of which showed positive results for cocaine, and failed to submit to random drug screens requested by DSS on five occasions in July, September, and October of 2018.

The trial court further found that respondent-father had maintained housing and was receiving social security disability benefits. He had not participated in counseling since 7 August 2018, and he had failed to participate in recommended relapse prevention group services since July 2018. He also admitted to relapsing, testing positive for cocaine on four occasions between June and August of 2018 and testing positive for marijuana and amphetamines on 2 October 2018. Respondent-father failed to submit to drug screens requested by DSS on seven occasions from June to October of 2018. The trial court changed the permanent plan to adoption with

a concurrent plan of reunification and ordered DSS to file a petition to terminate respondents' parental rights within sixty days.

On 2 January 2019, DSS filed a petition to terminate respondents' parental rights, alleging that they had neglected Joshua and that such neglect was likely to reoccur if he were returned to respondents, *see* N.C.G.S. § 7B-1111(a)(1) (2019), and that they had willfully left Joshua in foster care or a placement outside the home for more than twelve months without making reasonable progress to correct the conditions that led to his removal, *see* N.C.G.S. § 7B-1111(a)(2).

Following a hearing held from 15 April to 17 April 2019, the trial court entered an order on 17 May 2019 concluding that both grounds alleged in the petition existed so as to warrant the termination of respondents' parental rights. The trial court also determined that it was in Joshua's best interests that respondents' parental rights be terminated. *See* N.C.G.S. § 7B-1110(a) (2019). Respondents gave notice of appeal to this Court pursuant to N.C.G.S. § 7B-1001(a1)(1).

**Analysis**

**I.  Respondent-Father's Appeal**

On appeal, respondent-father contends that the trial court erred in concluding that there was a likelihood of future neglect of Joshua by him and that he did not make reasonable progress to correct the conditions that led to Joshua's removal. *See* N.C.G.S. § 7B-1111(a)(1)–(2). Because only one ground is necessary to support a termination of parental rights, we address respondent-father's arguments as they

relate to the ground of neglect. *In re Moore*, 306 N.C. 394, 404, 293 S.E.2d 127, 133 (1982) ("If either of the . . . grounds aforesaid is supported by findings of fact based on clear, cogent and convincing evidence, the order appealed from should be affirmed."); *see also* N.C.G.S. § 7B-1111(a) ("The court may terminate the parental rights upon a finding of one or more [grounds for termination.]").

Our Juvenile Code provides for a two-step process for the termination of parental rights—an adjudicatory stage and a dispositional stage. N.C.G.S. §§ 7B-1109, -1110 (2019). During the adjudicatory stage, the petitioner bears the burden of proving by "clear, cogent, and convincing evidence" the existence of one or more grounds for termination under section 7B-1111(a). N.C.G.S. § 7B-1109(e), (f). If the trial court finds that a ground exists for termination, the matter proceeds to the dispositional stage, at which point the trial court must "determine whether terminating the parent's rights is in the juvenile's best interest." N.C.G.S. § 7B-1110(a).

We review a trial court's adjudication "to determine whether the findings are supported by clear, cogent and convincing evidence and the findings support the conclusions of law." *In re Montgomery*, 311 N.C. 101, 111, 316 S.E.2d 246, 253 (1984). "Where no exception is taken to a finding of fact by the trial court, the finding is presumed to be supported by competent evidence and is binding on appeal." *Koufman v. Koufman*, 330 N.C. 93, 97, 408 S.E.2d 729, 731 (1991). The trial court's conclusions of law are reviewable de novo on appeal. *In re C.B.C.*, 373 N.C. 16, 19, 832 S.E.2d 692,

695 (2019) (citing *In re S.N.*, 194 N.C. App. 142, 146, 669 S.E.2d 55, 59 (2008), *aff'd per curiam*, 363 N.C. 368, 677 S.E.2d 455 (2009)).

Subsection 7B-1111(a)(1) allows for the termination of parental rights if the trial court finds that the parent has neglected his or her child to such an extent that the child fits the definition of a "neglected juvenile" under N.C.G.S. § 7B-101(15). N.C.G.S. § 7B-1111(a)(1). A neglected juvenile is statutorily defined, in pertinent part, as a juvenile "whose parent, guardian, custodian, or caretaker does not provide proper care, supervision, or discipline; . . . or who lives in an environment injurious to the juvenile's welfare[.]" N.C.G.S. § 7B-101(15) (2019).

Generally, "[t]ermination of parental rights based upon this statutory ground requires a showing of neglect at the time of the termination hearing." *In re D.L.W.*, 368 N.C. 835, 843, 788 S.E.2d 162, 167 (2016) (citing *In re Ballard*, 311 N.C. 708, 713–15, 319 S.E.2d 227, 231–32 (1984)). However, "if the child has been separated from the parent for a long period of time, there must be a showing of past neglect and a likelihood of future neglect by the parent." *Id.* at 843, 788 S.E.2d at 167. When determining whether future neglect is likely, "the trial court must consider all evidence of relevant circumstances or events which existed or occurred *either before or after* the prior adjudication of neglect." *In re Ballard*, 311 N.C. at 716, 319 S.E.2d at 232–33. "The determinative factors must be the best interests of the child and the fitness of the parent to care for the child *at the time of the termination proceeding*." *Id.* at 715, 319 S.E.2d at 232.

In its termination order, the trial court found that Joshua was adjudicated to be a neglected juvenile on 17 January 2018 and determined that "[r]epetition of neglect is certain given [respondents'] lack of sobriety." The trial court made the following pertinent findings of fact in support of its conclusion that grounds existed to terminate respondent-father's parental rights under N.C.G.S. § 7B-1111(a)(1): Before Joshua was born, respondent-father had struggled with an opiate addiction for several years. Joshua was born in November 2017 at thirty-three weeks gestation, and his meconium tested positive for cocaine and methadone. On 13 November 2017, DSS received a report and initiated an investigation due to concerns about respondents' substance abuse. On 21 November 2017, respondent-father tested positive for methadone, benzoylecgonine, cocaine, cocaethylene, morphine, norcocaine, and heroin, and respondent-mother tested positive for methadone, cocaine, benzoylecgonine, and norcocaine. Respondent-father's case plan included participating in substance abuse treatment, completing parenting classes, and obtaining and maintaining appropriate and stable housing and verifiable income.

The trial court further found that in January 2018, respondent-father completed the Substance Abuse Intensive Outpatient Program (SAIOP) at Coastal Horizons Center, Inc. On 23 January 2018, respondents were accepted into DSS's IRP. Initially, they were actively engaged in the program and complied with recommended services by engaging in substance abuse treatment, medication management, and daily methadone dosing; by participating in weekly therapy; and

by working with a parenting coach and demonstrating the skills that they had learned during their interactions with Joshua. Due to their progress with their case plans, on 26 April 2018, respondents' visitation was expanded to include three unsupervised overnight visits. However, on 30 May 2018, respondent-father tested positive for benzoylecgonine, cocaine, cocaethylene, and norcocaine, and, on 1 June 2018, he tested positive for cocaine. He denied using controlled substances and offered multiple explanations for the positive results. Respondent-mother also tested positive for benzoylecgonine, cocaine, norcocaine, and cocaine metabolite on 30 May 2018.

Respondents' level of compliance with the IRP began to wane in June 2018. They missed multiple parental coaching sessions, sessions with their counselor, and visits with Joshua. On 8 June 2018, respondents admitted to relapsing and to continued use of controlled substances. Due to repeated positive drug screens and their failure to appropriately address their substance abuse concerns, respondents' overnight visits with Joshua were suspended on 9 June 2018, and respondents were discharged from the IRP on 25 July 2018.

The trial court also found that on 23 October 2018, respondent-father completed an updated comprehensive clinical assessment, which resulted in diagnoses of cannabis, alcohol, anxiolytic, cocaine, and opioid use disorders. It was recommended that he re-engage in SAIOP and participate in community support and twelve-step support groups. It was further recommended that he engage in individual

and group therapy for maintenance of relapse prevention and recovery after his completion of SAIOP.

From 26 October 2018 to 14 December 2018, respondent-father attended seventeen out of twenty-three SAIOP group sessions. After reporting that he could no longer sit down for the entirety of the three-hour group sessions due to ongoing physical issues with his multiple sclerosis, a modified schedule was presented to respondent-father on 16 January 2019, which included attending a relapse prevention group one time per week for one hour, a support group meeting one time per week for one hour, and an individual counseling session once per month for one hour. By the time of the termination hearing in mid-April, respondent-father had only attended three group sessions and three individual sessions.[3]

The trial court made detailed findings regarding the results of respondent-father's drug tests. On 11 January 2019, respondent-father's underarm hair follicles tested positive for cocaine metabolite benzoylecgonine, cocaine, cocaethylene, and norcocaine, and, on 15 February and 7 March 2019, his underarm hair follicles tested positive for cocaine metabolite benzoylecgonine, cocaine, and cocaethylene. The trial court found that hair screens using underarm hair were "not equivalent to hair screens using head hair" because while hair removed from the scalp would show

---

[3] While finding of fact 31 states that respondent-father attended only "two group sessions," it lists three separate dates. The testimony at the termination hearing demonstrates that respondent-father attended three group sessions.

"three months of use assuming one half inch hair growth per month[,]" hair removed from the underarm "could show use within one year as the blood supply is not as abundant."

On 15 February 2019, respondent-mother informed a social worker that respondent-father was excessively drinking alcohol, and respondent-father tested positive for alcohol on 4 March, 11 March, 14 March, 18 March, and 12 April 2019 with "high levels of alcohol in his system." The trial court found that respondent-father did not appreciate the "gravity of his drinking problem" and did not "accept that he has an alcohol addiction."

On 27 February 2019, respondent-mother made allegations of domestic violence perpetrated by respondent-father. On 15 March 2019, respondent-father was ordered to complete the Domestic Violence Offender Program as part of his case plan, but he had failed to initiate the program at the time of the termination hearing. Despite the "current discord in the home" and respondents' insistence that they were separated, respondents remained in an ongoing relationship.

In his brief, respondent-father does not dispute the trial court's prior adjudication of neglect. Rather, he challenges several of the trial court's findings of fact as unsupported by clear, cogent, and convincing evidence and the trial court's conclusion of law that there was a "high probability that the neglect will continue in the foreseeable future." We address his contentions in turn.

### A. Findings of Fact

Respondent-father argues that the portion of finding of fact 36 that states he showed "high" levels of alcohol in his system is not supported by the evidence and is contradicted by the portion of finding of fact 35, which provides that "[i]t is not possible to quantify the amount of alcohol . . . included in the levels identified." Respondent-father asserts that the word "high" should be stricken from finding of fact 36. We disagree.

In finding of fact 34, which has not been challenged, the trial court listed the results of respondent-father's random drug screens conducted from 19 November 2018 to 18 March 2019. During that testing, respondent-father tested positive for EtG and EtS with levels greater than 25,000 ng/ml on 4, 11, 14, and 18 March 2019. Daniel Shapiro, a physician's assistant and the lead clinician at Medac Corporate Health, testified at the termination hearing that "EtG and EtS is our 80-hour alcohol test. It picks up alcohol in the system in the urine up to 80 hours after the use of alcohol." The "[c]ut-off" level for the detection of EtG is 500 ng/ml and 100 ng/ml for EtS. The following exchange took place at the termination hearing between counsel for respondent-father and Mr. Shapiro:

> Q. So there's a — there's a possibility as far as the EtG and the EtS amounts are concerned with my client specifically, like, it's possible that he could have one beer every day and they could result in the numbers that he has. Or he could have three beers in one setting. And, I mean, you can't — I guess the point is you can't distinguish whether it's one or the other?

A.      I can't say for sure. You have to, you know, talk to a physiologist to get that answered.

Q.      Right.

A.      But I — I can say that the 25,000 is a high level. It is.

. . . .

A.      We have had positive EtG and EtS levels periodically throughout time and I don't see too many that high.

This testimony supports the trial court's finding that although it was not possible to quantify the number of alcoholic drinks respondent-father had consumed in order for his levels to read greater than 25,000 ng/ml for EtG and EtS, Mr. Shapiro considered EtG and EtS levels greater than 25,000 ng/ml to constitute a "high" level. The portions of findings of fact 35 and 36 at issue are therefore not mutually exclusive. Clear, cogent, and convincing evidence exists to support the challenged portion of finding of fact 36.

Next, respondent-father challenges the portion of finding of fact 60 providing that "[r]espondent-[p]arents obtained and maintained independent housing . . . [in] Wilmington, North Carolina throughout the case. They continue residing in the home." At the termination hearing, respondents testified that respondent-mother had moved out of the house in February 2019. Yet, unchallenged finding of fact 57 establishes that on 14 March 2019, DSS visited respondent-father's home to see if respondent-mother continued to live in the home and discovered that respondent-

-13-

mother was present. A DSS foster care social worker testified that a week prior to the termination hearing, she "stopped by the home" and respondent-mother's belongings were still in the home. At the termination hearing, respondent-father testified that respondent-mother's name was on the lease to the residence and that he had not yet removed her name from the lease. When asked if respondent-mother was "still contributing to the bills" at the house, respondent-father answered "[s]he tries."

Based on the foregoing, the trial court made the reasonable inference that respondents continued to live together at the time of the termination hearing. *See In re D.L.W.*, 368 N.C. at 843, 788 S.E.2d at 167–68 (stating that it is the trial court's duty to consider all the evidence, pass upon the credibility of the witnesses, and determine the reasonable inferences to be drawn therefrom). Although there was record evidence that would have supported a contrary decision, "this Court lacks the authority to reweigh the evidence that was before the trial court." *In re A.U.D.*, 373 N.C. 3, 12, 832 S.E.2d 698, 704 (2019); *see also In re Montgomery*, 311 N.C. at 110–11, 316 S.E.2d at 252–53 ("[O]ur appellate courts are bound by the trial courts' findings of fact where there is some evidence to support those findings, even though the evidence might sustain findings to the contrary.").

Respondent-father also argues that finding of fact 58 is not supported by clear, cogent, and convincing evidence. Finding of fact 58 states that respondents "are consistently seen together at Coastal Horizons for their daily doses [of methadone]. Caitlyn Garner and Kelly Long have seen them together consistently since their

claims to be apart." However, this finding of fact is not necessary to affirm the trial court's conclusion that grounds existed under N.C.G.S. § 7B-1111(a)(1) to terminate respondent-father's parental rights, and we therefore decline to address it. *See In re T.N.H.*, 372 N.C. 403, 407, 831 S.E.2d 54, 58–59 (2019) ("[W]e review only those findings necessary to support the trial court's determination that grounds existed to terminate respondent's parental rights." (citing *In re Moore*, 306 N.C. at 404, 293 S.E.2d at 133)).

### B. Conclusions of Law

Respondent-father also argues that the trial court's determination that there was a "high probability that the neglect will continue in the foreseeable future" and its determination that DSS had established the grounds alleged in the petition to terminate respondent-father's parental rights were not supported by sufficient evidence and competent findings of fact. We are not persuaded.

As an initial matter, respondent-father correctly notes that the trial court's determination that neglect is likely to reoccur if Joshua was returned to his care is more properly classified as a conclusion of law. *See In re S.D.*, 839 S.E.2d 315, 330 (N.C. 2020). The determination that DSS established the grounds alleged in the petition to terminate respondent-father's parental rights is likewise a conclusion of law. *See id.* Although the trial court labeled these conclusions of law as findings of fact, "findings of fact [which] are essentially conclusions of law . . . will be treated as

such on appeal." *State v. Sparks*, 362 N.C. 181, 185, 657 S.E.2d 655, 658 (2008) (alterations in original) (citation omitted).

In the present case, the trial court's conclusion of law that there was a high likelihood of a repetition of neglect if Joshua was returned to respondent-father's care is supported by the following factual findings, which are either unchallenged—and therefore binding on appeal—or supported by clear, cogent, and convincing evidence as discussed above: respondent-father relapsed in May 2018; he failed to successfully complete SAIOP after re-engaging with the program in October 2018; he failed to appreciate the gravity of his alcohol problem and to accept that he had an alcohol addiction; he did not engage in the Domestic Violence Offender Program; he made a choice to remain in a relationship with and to live with respondent-mother, who continued to struggle with addiction; and there was current domestic discord in the home between respondents.

In reaching its conclusion, the trial court relied heavily on respondent-father's lack of sobriety. Respondent-father asserts that he "overcame years of substance abuse and addiction" when Joshua was born, "took responsibility" for his relapse and re-engaged in substance abuse treatment, and "maintained his sobriety for a considerable period of time." While we recognize respondent-father's initial progress from the end of January until May of 2018—during which he actively engaged in the IRP and complied with recommendations received from his comprehensive clinical assessments—the evidence and findings of fact establish that he had failed to make

meaningful progress in addressing his addiction issues by the time of the termination hearing. *See In re M.A.W.*, 370 N.C. 149, 154–55, 804 S.E.2d 513, 517–18 (2017) (holding that a respondent's failure to comply with the terms of his case plan with respect to addressing ongoing substance abuse issues—along with other relevant findings of fact—supported the trial court's decision to terminate the respondent's parental rights on the basis of neglect).

The trial court was entitled to conclude that based upon respondent-father's long history of substance abuse, his relapse in May 2018, his failure to follow the recommendations of his updated comprehensive clinical assessment, and his failure to appreciate the gravity of his alcohol use and to accept that he had an alcohol addiction, there was a probability that there would be a repetition of neglect based on his lack of sobriety. *See In re J.A.M.*, 372 N.C. 1, 9, 822 S.E.2d 693, 698–99 (2019) (quoting *In re McLean*, 135 N.C. App. 387, 396, 521 S.E.2d 121, 127 (1999)) (stating that in neglect cases involving newborns, "the decision of the trial court must of necessity be predictive in nature, as the trial court must assess whether there is a substantial risk of future . . . neglect of a child based on the historical facts of the case").

The trial court's findings of fact demonstrate that respondent-father completed an updated comprehensive clinical assessment on 23 October 2018, in which he was diagnosed with, among other things, alcohol use disorder. It was recommended that he re-engage in SAIOP. To accommodate his needs arising out of his issues with

multiple sclerosis, a modified schedule was offered to him in January 2019, which required him to attend a relapse prevention group one time per week for one hour, attend a support group meeting one time per week for one hour, and attend an individual counseling session once per month for one hour. By the time of the termination hearing, he had attended only three group sessions and three individual sessions.

The trial court's findings of fact further show that respondent-father tested positive for cocaine on 11 January, 15 February, and 7 March 2019. But because the hair source was his underarm hair, the trial court found that "[h]air removed from under the arm could show use within one year." Although the results of these tests could not conclusively establish that respondent-father was using cocaine at the time of the termination hearing, respondent-father tested positive for alcohol on 4, 11, 14, and 18 March 2019, showing "high levels of alcohol in his system." Respondent-father also tested positive for alcohol at Coastal Horizons Center, Inc. on 12 April 2019, just days before the termination hearing. The trial court found that because respondent-father suffered from hepatitis C, "alcohol use could kill him." Nevertheless, he failed to "accept that he has an alcohol addiction" and to "appreciate the gravity of his drinking problem."

Respondent-father argues that the fact that he "has drank alcohol is not sufficient by itself to support a determination of neglect without proof of an adverse impact on Joshua." In addition to the fact that his argument seeks to minimize the

severity of his alcohol addiction, however, he ignores the fact that his alcohol abuse was not the sole factor upon which the trial court's decision was based. As discussed above, the trial court also considered respondent-father's relapses, his failure to successfully complete SAIOP, his failure to initiate the Domestic Violence Offender Program, his choice to remain in a relationship with and live with respondent-mother, who continued to struggle with addiction issues of her own, and the current domestic discord in the home in concluding that there was a high likelihood of a repetition of neglect.

Respondent-father also argues that the trial court erred in concluding that there was a likelihood of future neglect if Joshua was returned to his care because he demonstrated during his visitations with Joshua that he had "obtained the skills and knowledge necessary to appropriately parent." It is true that findings of fact 15 and 16 demonstrate that when respondents were actively engaged in the IRP, they were working with a parenting coach and demonstrating the skills learned during their interactions with Joshua. Because respondents were showing improvement at the time, on 26 April 2018, visitation was expanded to unsupervised, overnight visits.

Nonetheless, respondent-father fails to take into account the evidence showing that he was unable to sustain this initial progress. Finding of fact 19 demonstrates that respondent-father tested positive for benzoylecgonine, cocaine, cocaethylene, and norcocaine on 30 May 2018 and tested positive for cocaine on 1 June 2018. Respondent-mother tested positive for cocaine, among other substances, near the end

of May 2018. Findings of fact 20 and 21 indicate that although DSS had arranged for respondents to participate in the ABC program, they were never able to begin the program due to continued positive drug screens and Joshua not being in the home. Ultimately, on 9 June 2018, respondents' overnight visits were suspended due to the positive drug screens, as reflected in finding of fact 24. Moreover, the trial court found in its 9 November 2018 permanency planning order that despite being offered weekly two-hour supervised visits with Joshua following the suspension of overnight visits, respondents had failed to consistently participate in scheduled visitation.

Finally, respondent-father asserts that the trial court appears to have based its conclusion that there was a likelihood of future neglect "on the failure of [respondent-mother] to appropriately treat her addictions" and that the trial court erred in making this conclusion given that respondent-father "understood and agreed that contact with [respondent-mother] had to be limited unless and until she successfully engaged in treatment for her substance abuse." The trial court's findings of fact recognize that respondent-mother continued to struggle with her addiction and reflect the fact that the trial court considered respondent-father's continuing relationship with respondent-mother. The trial court noted the "current domestic discord" between respondents. The trial court's findings of fact establish that on 8 March 2019, respondent-mother reported to Joshua's foster parent that respondent-father had "trashed" their home, pushed her, hit her, and threw her belongings out of the home. Due to respondent-mother's continued reports of domestic problems in

the home, empowerment classes were added to her case plan and the Domestic Violence Offender Program was added to respondent-father's case plan. Neither respondent-mother nor respondent-father had initiated the programs aimed at addressing these issues. Moreover, respondent-mother admitted to slapping respondent-father in the face, and there was evidence that there had "been frequent and loud disputes" between respondents. There was nothing improper about the trial court relying on this evidence in making its findings of fact.

Furthermore, we are unconvinced that respondent-father "understood and agreed" that contact with respondent-mother had to be limited unless or until she successfully engaged in substance abuse treatment. At the time of the termination hearing, evidence existed—as reflected in the trial court's findings of fact—that respondents continued to live together and maintain a relationship. Findings of fact 56 and 59 establish that at the time of the termination hearing, respondent-mother was two months pregnant with respondent-father's child and, "despite their insistence that they [were] separated[,]" respondents were still in a relationship— having repeatedly told their social worker that they remained a couple. Thus, the trial court was not required to credit respondent-father's testimony that he would separate from respondent-mother in order to regain custody of Joshua. *See In re D.L.W.*, 368 N.C. at 843, 788 S.E.2d at 167–68.

Based on the foregoing, we hold that the trial court did not err by determining that grounds existed under N.C.G.S. § 7B-1111(a)(1) to terminate respondent-father's

parental rights. Furthermore, respondent-father does not challenge the trial court's conclusion that termination of his parental rights was in Joshua's best interests. *See* N.C.G.S. § 7B-1110(a). Accordingly, we affirm the trial court's 17 May 2019 order terminating respondent-father's parental rights.

## II.  Respondent-Mother's Appeal

Respondent-mother's counsel has filed a no-merit brief on her behalf pursuant to Rule 3.1(e) of the North Carolina Rules of Appellate Procedure. Counsel has advised respondent-mother of her right to file pro se written arguments on her own behalf with this Court, and counsel has provided her with the documents necessary to do so. However, respondent-mother has not submitted any written arguments.

We independently review issues contained in a no-merit brief filed pursuant to Rule 3.1(e). *In re L.E.M.*, 372 N.C. 396, 402, 831 S.E.2d 341, 345 (2019). In her brief, respondent-mother's counsel identified two issues that could arguably support an appeal but stated why she believed both of these issues lacked merit. Based upon our careful review of the issues identified in the no-merit brief in light of our consideration of the entire record, we are satisfied that the trial court's 17 May 2019 order was supported by competent evidence and based on proper legal grounds.

### Conclusion

For the reasons stated above, we affirm the trial court's order terminating respondents' parental rights.

AFFIRMED.